# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>ALEXANDRU SABAU | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>08-1512M |

Complaint for violation of Title 21, United States Code, Sections 841(a)(1).

| NAME OF MAGISTRATE JUDGE<br>Hon. Jennifer T. Lum | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles |
|---|---|---|

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| April 28, 2008 | Orange County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 841(a)(1)]

On or about April 28, 2008, in Orange County, within the Central District of California, defendant ALEXANDRU SABAU knowingly and intentionally distributed approximately 5,000 tablets of methylenedioxymethamphetamine (also known as MDMA and Ecstasy), a schedule I controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
   (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Michael Corkery |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - Immigration and Customs Enforcement |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>June 25, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA Angela L. Sanneman     REC: Detention

**A F F I D A V I T**

I, Michael Corkery, being duly sworn, hereby depose and say:

1. I am a Special Agent ("SA") of the U.S. Immigration and Customs Enforcement ("ICE"). I am currently assigned to the ICE Office of the Assistant Agent in Charge, Los Angeles International Airport ("LAX"), Los Angeles, California. I have been an SA with ICE since November 2002. While employed by Customs, I have received formal training in the investigation of violations involving the smuggling and distribution of controlled substances at the Federal Law Enforcement Training Center in Georgia. Prior to working for Customs, I was a U.S. Customs Inspector for approximately six (6) years and in the U.S. Coast Guard for approximately four (4) years.

2. Upon the completion of my training with ICE, I was assigned to the Assistant Agent in Charge at the Los Angeles International Airport. At this office I have participated in numerous investigations relating to narcotics violations. I have debriefed confidential informants, criminal defendants, and other persons engaged in narcotics smuggling. I have also been

1

actively involved in the surveillance and arrest of narcotics smugglers and have performed undercover duties during which drug and non-drug evidence was obtained.

3. Based upon my training and experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers who are experienced in narcotics investigations, I know the following to be true:

a. Drug traffickers typically maintain not only drugs, but drug paraphernalia such as bindles, inhaling devices, scales, diluents, cutting agents, and narcotics packaging materials. These items are generally maintained where the drug traffickers package the drugs, including stash and transaction houses for this purpose.

b. Drug traffickers typically find it necessary to store large sums of cash received from the sale and distribution of controlled substances pending the conversion of the cash to other instruments. In addition, because drug traffickers' business is typically conducted on a cash basis, they frequently secure the proceeds within safes or hidden compartments inside their residences or stash/transaction houses, and continue to do so on a fairly constant and consistent basis for long periods of time.

2

c.  Documents relating to safety deposit boxes, and corresponding keys, are also maintained in the stash houses of illegal drug traffickers.  In part, this is due to the fact that drug traffickers typically receive payment for illegal drug purchases in cash, and they are ordinarily wary of depositing their illicit proceeds into banks for fear that they may be seized and forfeited or that the large deposits may draw attention to their illegal activities.

d.  Since drug trafficking is an ongoing criminal enterprise, drug traffickers will keep records associated with their narcotics activities for an extended period of time.  Many drug traffickers (even including more sophisticated drug traffickers) are unaware or are less sensitive to the fact that financial documents generally can provide substantial circumstantial evidence of large-volume drug sales.  Because possession of the documents themselves, unlike possession of drugs, is not illegal, drug traffickers often fail to take precautions to destroy or conceal the documentation.  Documentation may survive for many months, sometimes years, after a large volume drug transaction has occurred.

e.  Drug traffickers frequently maintain books, records, receipts, bank statements, deposit slips, canceled checks, money

3

order receipts, records of electronic money transfers, notes, ledgers, pay/owe sheets, money orders, and other documents relating to the transportation, ordering sale, and distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where the drug traffickers have ready access to them, such as their residence or stash/transaction houses.

    f.    It is common for drug traffickers to hide contraband, proceeds of drug sales, records of drug transactions, weapons, ammunition, cashes of drugs, large amounts of currency, financial instruments, keys for safe deposit boxes, precious metals, jewelry, and other items of value and or proceeds of drug transactions relating to obtaining, transferring, hiding, or spending large sums of money made from controlled substance trafficking activities in secure locations within residences or stash/transaction locations for ready access and to conceal them from law enforcement authorities.

    g.    When drug traffickers amass proceeds from the sale of a controlled substance, they commonly attempt to legitimize these profits. Drug traffickers use various means for these purposes, including but not limited to, use of securities, cashier's checks, money drafts, traveler's checks, bonds, stock

certificates, certificates of deposit, letters of credit, brokerage houses, real estate, shell corporations and business fronts. These items are commonly stored in their residence or stash/transaction locations.

    h.    Drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses telephone numbers and/or paging numbers for their criminal associates. These records are typically maintained in their residence or stash/transaction houses.

    i.    Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession, stored in their residence or stash/transaction houses.

    j.    Drug traffickers typically use communication devices, such as telephone paging devices, beepers, mobile telephones and car phones. These communication devices are commonly used by drug traffickers to communicate with their source of supply and/or customers in order to conduct drug transactions. Stored within these devices are telephone numbers linked with drug trafficking. These devices may be kept on their person or in their stash/transaction houses.

    k.    Documents or things showing the use of the SUBJECT

VEHICLE, including any related contracts and receipts.

## PURPOSE OF AFFIDAVIT

4.  I make this affidavit in support of a criminal complaint and the issuance of an arrest warrant for Alexandru SABAU ("SABAU") for conspiracy to distribute ecstasy, in violation of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances). Except as otherwise noted, I make this affidavit based on my personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources: oral and written reports and documents about this investigation, including physical surveillance reports, which I have received from other federal and local law enforcement agents.

5.  In addition, this affidavit is made in support of a search warrant for: (1) the premises at 9129 Residencia Street, Newport Beach, CA (hereinafter the "SUBJECT PREMISES"); and (2) a white Dodge sedan, Nevada license 281VAR (hereinafter the "SUBJECT VEHICLE").

**The Subject Premises to Be Searched**

6.  The premises to be searched is described in Attachment A and is an apartment at 9129 Residencia Street (the "SUBJECT PREMISES"). This apartment is in a multi-story, tan, stucco apartment complex. The complex has a tiled roof. Above the parking entrance is black lettering that shows apartments 9110-9439, which faces west. The apartment is located on the second floor facing north, with black numbers stating "9129" on the left-hand side of the door.

7.  The vehicle to be searched is described in Attachment A(1) and is a white Dodge sedan Nevada license plate number 281VAR (the "SUBJECT VEHICLE").

**The Items to Be Seized**

8.  The items to be seized from the SUBJECT PREMISES and SUBJECT VEHICLE are described in Attachment B and are as follows:

    a.  Any illegal drugs, including MDMA, and related paraphernalia involved in its use, sales, packaging, transportation or manufacture, including pill presses, packaging material, plastic baggies, pill counters and scales.

    b.  United States currency over $1,000.

    c.  Records, books, receipts, and other papers relating to the manufacture, distribution and sale of MDMA (ecstasy), even

7

though these documents may be in code.

    d.    Drug or money ledgers, buyer lists, seller lists, and recordation of sales.

    e.    Personal telephone books, address books, telephone bills, photographs, videotapes, and documents and other items reflecting names, addresses, telephone numbers, and communications.

    f.    Firearms and illegal weapons.

    g.    Locked luggage and other locked compartments and any keys that fit these locks.

    h.    Documents or articles of personal property showing occupancy of the SUBJECT PREMISES, including telephone bills, rent receipts, keys, utility company receipts, papers, documents, letters, canceled mail envelopes and clothing.

    i.    Cellular telephones, paging devices, and any information contained in the electronic memories of those items.

    j.    Records of mail and communication services for paging devices, cellular phones, car phones and other communication devices.

## PROBABLE CAUSE

### SABAU Sells CI 1,000 Ecstasy Tablets on April 12, 2008

    9.    On April 12, 2008, ICE/ASAC/LAX Special Agents (SA),

8

Santa Monica Police Department ("SMPD") Detectives ("DT") and I utilized a confidential informant "CI" to purchase 1,000 ecstasy tablets from "ALEX", later identified as Alexandru SABAU. On April 11, 2008, the CI told me the following:

    a.    The CI had contacted SABAU the previous night, April 11, 2008, and stated that he wanted to buy 1,000 ecstasy tablets on April 12, 2008. SABAU agreed and stated that he wanted to conduct the sale at Tully's Coffee shop located at the corner of Bison Ave. and MacArthur Blvd. in Newport Beach, CA ("Tully's"). The CI previously had conducted ecstasy purchases with SABAU at this location as well as locations in Santa Monica, CA.

    10.    At approximately 0945 hours, SMPD DT Vince Gamache and I met with and searched the CI and his vehicle for contraband with negative results. I gave the CI $3,500 to purchase the ecstasy. DT Gamache and I followed the CI to Tully's.

    11.    At approximately 1025 hours, I and several SMPD DTs observed the CI meet with SABAU in front of Tully's. I and several SMPD DTs then observed the following:

    a.    At approximately 1040 hours, SABAU pulled a brown paper bag from the planter located next to his seat and gave it to the CI. The CI went inside Tully's and returned a short time later and handed SABAU a cigarette box that contained the

9

payment. The CI and SABAU spoke for a few minutes and then the CI departed the area while being surveilled by DT Gamache and me.

12. DT Gamache and I met with the CI at a secure location. DT Gamache and I retrieved a brown paper bag containing approximately 1,000 ecstasy tablets and then searched the CI and his vehicle for contraband with negative results.

13. Shortly thereafter, DT Thomas McLaughlin contacted me and stated that after the CI left, other SMPD units surveilled SABAU as he walked away from the area. DT Mclaughlin told me that he observed the following:

   a. SABAU appeared to be conducting counter-surveillance, going into several shops for a short period of time and continuously looking around. SABAU then walked to the opposite end of the shopping area and entered a blue Chevy sedan (CA 5YIG229), which was a Hertz rental car. SABAU then drove to the SUBJECT PREMISES.

14. On April 24, 2008, I received a report from the Los Angeles County Sheriff's lab stating that the approximately 1,000 ecstasy pills contained MDMA (ecstasy).

**SABAU Sells CI 5,000 Ecstasy Tablets on April 28, 2008**

15. On April 28, 2008, ICE/ASAC/LAX SA's and I and several

SMPD DTs utilized the same CI to purchase 5,000 ecstasy tablets from SABAU at the same Tully's referenced above.  DT McLaughlin and DT Gerardo Leyva told me the following:

   a.   At approximately 0800 hours, SMPD DTs McLaughlin and Leyva initiated surveillance at the SUBJECT PREMISES; the same address to which SABAU went directly after the April 12, 2008, 1,000 ecstasy tablet buy/walk.  SMPD DTs observed SABAU's vehicle parked at the residence.

   b.   At approximately 1000 hours, DT Leyva observed SABAU exit the elevator area of the SUBJECT PREMISES carrying a white object.  DT Leyva saw SABAU enter his vehicle and depart from the area.

   16.   At approximately 1050 hours, Special Agent DT Ryan Gradle and I met with and searched the CI and his vehicle for contraband with negative results.  I gave the CI $10,000 for the ecstasy and also provided the CI with a recording device.  DT Gradle and I followed the CI to Tully's.

   17.   I and several SMPD DTs then observed the following:

   a.   At approximately 1056 hours, the CI arrived at Tully's.

   b.   At approximately 1110 hours, SABAU arrived at Tully's carrying a white box.  SABAU went into Tully's and came out with

11

a beverage and then sat with the CI in front of Tully's. SABAU went into Tully's two more times briefly and again sat with the CI.

    c.    At approximately 1130 hours, the CI accepted the white box from SABAU and departed the area while being followed by DT Gradle and me.

    18.    At approximately 1140 hours, DT Gradle and I retrieved the white box from the CI. DT Gradle and I then searched the CI and his vehicle for contraband with negative results. I observed DT Gradle open the white box, which happened to be a white Fed-Ex box. I observed DT Gradle discover approximately 5,000 ecstasy tablets inside the box. I then retrieved the recording device from the CI.

    19.    Shortly thereafter, DT McLaughlin contacted me and stated that he observed SABAU departing Tully's after the CI departed. DT McLaughlin told me that he observed SABAU then go back to the SUBJECT PREMISES.

    20.    On May 27, 2008, I received a report from the Drug Enforcement Administration Southwest Lab stating that the approximate 5,000 pills recovered on April 28, 2008, contained MDMA (ecstasy).

## Additional Relevant Surveillance at the SUBJECT PREMISES and of the SUBJECT VEHICLE on May 8, 2008, June 12, 2008 and June 24, 2008

21. Over the course of our investigation, DT Gamache told me the following:

a. On May 8, 2008, Detective Gamache and other SMPD DT's were surveilling SABAU and contacted Newport Beach PD Officer Eric Masterson. Officer Masterson told DT Gamache that at approximately 1150 hours, Officer Peterson conducted a traffic stop of the vehicle SABAU was driving. SABAU identified himself and told Officer Peterson that he was living with his friend Nathaniel at the Residencia apartments just down the street.

b. On June 12, 2008, SMPD units were surveilling SABAU while he drove around in the Newport Beach area. While SABAU drove around, DT Gamache spoke with the manager of the apartment complex that SMPD DTS had observed SABAU going in and out of during the recent surveillances, which was the apartment complex containing the SUBJECT PREMISES. DT Gamache asked Kelly, the apartment manager, who was assigned to parking spaces 168 and 169. Kelly stated that spaces 168 and 169 are assigned to Nathanael Lineham.

13

   c.     At approximately 1350 hours on June 12, 2008, SMPD DTs observed SABAU arrive at the apartment complex containing the SUBJECT PREMISES and park the SUBJECT VEHICLE in space 169. SABAU exited his vehicle and enter the elevator.

   22.    DT Baker told me that he then observed SABAU exit the elevator and enter apartment 9129.

   23.    DT McLauglin told me that prior to June 12, 2008, he had observed SABAU parking the SUBJECT VEHICLE in space 169.

   24.    DT McLaughlin also told me that on June 24, 2008, at approximately 1545 hours, he saw SABAU park the SUBJECT VEHICLE in space 169.

**SABAU Intends to Trade Ecstasy for Cocaine from the CI's Supplier**

   25.    DT Gamache told me that the CI told him the following:

   a.     On several occasions in June 2008, the CI had contacted SABAU to purchase more ecstasy and SABAU stated that he was awaiting a shipment from Canada and that his driver was not available to transport the ecstasy to SABAU.

   b.     Throughout the investigation, SABAU asked the CI if he had a cocaine dealer. The CI previously told SABAU that he does have a cocaine dealer, but that he is large scale. SABAU had

14

asked the CI if the cocaine dealer was interested in trading cocaine for ecstasy. The CI stated that he would trade on a large scale. SABAU contacted the CI on more than one occasion to see if the CI could get approximately three kilograms of cocaine for a buyer in from Las Vegas. The CI stated that his supplier does not sell small quantities of cocaine.

26. DT Gamache told me the following:

a. On June 18, 2008, DT Gamache had the CI set up a meeting with SABAU at the same Tully's referenced above to discuss a large-scale cocaine/ecstasy swap and conduct a supposedly twenty-five kilogram cocaine flash[1] with the CI and SABAU.

b. On June 19, 2008, SMPD units set up at Tully's to observe the meeting.

c. DT Gamache had the CI call SABAU at approximately 1100 hours. DT Gamache also searched the CI and the CI's vehicle for contraband with negative results.

d. The CI told DT Gamache that at approximately 1200 hours, SABAU returned the CI's call and stated that he would be

---

[1] From my training and experience, I know that a drug flash is a brief and unanticipated display of drugs to an potential purchaser. A drug flash is performed to prove to the potential buyer that the seller can provide the drugs. The flash is brief and the purchaser often is not made aware of it in advance to avoid the risk that the purchaser and/or others may attempt to

15

at Tully's shortly.

e.  At approximately 1230 hours, DT Gamache and other SMPD DTs observed SABAU arrive at Tully's and meet with the CI.

f.  The CI later told DT Gamache that he stated to SABAU that his supplier was there and wanted to show SABAU something and that he wanted SABAU to meet the CI's cocaine supplier.

g.  DT Gamache saw the CI take SABAU over to his supplier's vehicle. The supplier was actually DT Leyva acting in an undercover capacity.

27.  DT Gamache told me that DT Leyva told him the following about his interactions with SABAU on June 19, 2008:

a.  After DT Leyva and SABAU were introduced, DT Leyva opened the trunk of his vehicle and then open a suitcase that had twenty-one kilograms of cocaine.

b.  DT Leyva told SABAU that it was twenty-five kilograms of cocaine. SABAU stated that he was very interested in making a cocaine-for-ecstasy deal. DT Leyva then closed the suitcase and the trunk and exited the area.

28.  DT Gamache told me the following:

a.  The CI told DT Gamache that after DT Leyva flashed the cocaine on June 19, 2008, he and SABAU agreed to exchange

---

steal the drugs.

twenty-five kilograms of cocaine for one hundred thousand ecstasy pills.

    b.    Shortly thereafter, the CI departed the area and met at a secure location with DT Gamache. DT Gamache retrieved his audio recorder and searched the CI and his vehicle for contraband with negative results.

    c.    On June 23, 2008, DT Gamache contacted the CI. The CI stated that SABAU called him several times over the weekend and asked if the CI's cocaine supplier was ready. The CI told SABAU that his supplier was ready. SABAU stated that his supplier had made preparations to have a driver drive the ecstasy from Canada to SABAU for the exchange and that the ecstasy should be here in a few days.

    29.    The CI has two felony convictions and three misdemeanor convictions from 1997-2007, all of which are drug related. He is currently attempting to work off current state charges.

## **CONCLUSION**

30. Based on the facts set forth herein, I believe that there is probable cause to demonstrate that Alexandru Sabau has violated Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances).

MICHAEL CORKERY
Special Agent
Immigration and Customs Enforcement

Subscribed and sworn to before me
this 25th day of June 2008.

THE HON. JENNIFER T. LUM
UNITED STATES MAGISTRATE JUDGE

18